UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEW RAU, et al.,

        Plaintiffs,

Case No. 19-10822

v

HON. MARK A. GOLDSMITH

CALVERT INVESTMENTS, LLC,

        Defendant.

_____/

## OPINION & ORDER
## GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS (Dkt. 11)

This matter is before the Court on Defendant Calvert Investments, LLC's ("Calvert") motion to dismiss Plaintiffs' First Amended Complaint (Dkt. 11). The motion has been fully briefed. Because oral argument will not assist in the decisional process, the motions will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). This action arises from Calvert's initiation of foreclosure proceedings following Plaintiffs' alleged default on two separate mortgages. Plaintiffs assert a variety of claims alleging various defects, irregularities, and fraudulent representations underlying the mortgage transactions and foreclosure proceedings. For the reasons stated below, the Court grants in part and denies in part Calvert's motion to dismiss.

## I. BACKGROUND

Since 2014, Plaintiff Matthew Rau has executed several mortgage loan transactions with Calvert as the lender. Am. Compl. ¶ 11 (Dkt. 9). Plaintiffs allege that in 2015, Calvert advised Rau to create a limited liability company to execute a mortgage agreement unrelated to the present action, explaining that doing so would enable Calvert to avoid certain state and federal regulations

1

of consumer loans.  Id. ¶ 14.  Acting in accordance with Calvert's request, Rau created Plaintiff

Mchrenzie Investments, LLC ("Mchrenzie").  Id. ¶ 15.

The present action stems from two mortgage loan transactions between the parties.  With

respect to the first mortgage loan, Calvert agreed to provide financing for the purchase of real

property located at 427 Windmill Point Drive, Flushing, Michigan (the "Windmill Property"),

which Plaintiffs allege Rau intended to use as his primary residence.  Id. ¶ 22.  Although Calvert

allegedly knew that the Windmill Property was to be used as Rau's residence, Calvert required

that the transaction be executed by Mchrenzie.  Id. ¶ 23.  On June 30, 2017, Mchrenzie and Calvert

executed loan agreement under which Calvert loaned Mchrenzie $80,000, secured by a

commercial real estate mortgage (the "Windmill Mortgage") on the Windmill Property.  Windmill

Promissory Note, Ex. 1 to Am. Compl.[1]

Under the terms of the Windmill Mortgage, Mchrenzie was required to pay any taxes

assessed against the Windmill Property.  Windmill Mortgage ¶ 5, Ex. 2 to Am. Compl.  In the

event of Mchrenzie's default on any of its obligations under the Windmill Mortgage, Calvert was

authorized, "without demand or notice, [to] pay any taxes," and to add the amount paid to

Mchrenzie's total indebtedness.  Id. ¶ 13.  Additionally, in the event of default, Calvert was

authorized, "without notice, and at its option," to accelerate the entire indebtedness due and

payable and, as permitted by law, to foreclose upon the Windmill Property.  Id. ¶ 14.  Mchrenzie

separately executed an acknowledgement confirming that Mchrenzie would be responsible for

paying taxes and that the property would not be owner-occupied as a primary residence.  See

Windmill Buyers Acceptance and Acknowledgement, Ex. A.3 to Def. Mot. (Dkt. 11-2).  However,

---

[1] Although the mortgage and loan agreement documents attached as exhibits to Plaintiffs'
Amended Complaint are not signed, Calvert attached signed versions of all documents as Exhibits
A.1 through A.7 to its motion (Dkt. 11-2).

Plaintiffs allege that Rau lived at the Windmill Property for a period of time until November 2017. Am. Compl. ¶ 31.

In connection with the second mortgage loan, Calvert agreed to finance Rau's purchase of real property located at 604 Warren Avenue, Flushing, Michigan (the "Warren Property"). Id. ¶¶ 32-33. On November 16, 2019, Rau and Calvert executed a loan agreement under which Calvert loaned Rau $115,000, secured by a mortgage (the "Warren Mortgage") on the Warren Property. See Warren Promissory Note, Ex. 4 to Am. Compl. The Warren Mortgage also required Rau to make an additional one-time payment of $12,500 to Calvert. Id. Although the terms of the Warren Mortgage provided that Rau was required to pay Calvert a sum to be held in escrow for the payment of taxes assessed against the Warren Property, Warren Mortgage ¶ 2, Ex. 5 to Am. Compl., the parties executed a disclaimer of this provision, under which Calvert waived the escrow requirement, Limited Waiver, Ex. A.6 to Def. Mot. (Dkt. 11-2). Accordingly, the operative portion of the Warren Mortgage provided that Rau was to pay taxes "on time directly to the person owed payment." Warren Mortgage ¶ 4.

In the event that the Warren Property became subject to a lien arising from the nonpayment of taxes, Calvert was authorized to provide Rau notice of the lien and ten days in which to cure. Id. If Rau defaulted on any obligations under the Warren Mortgage, Calvert was authorized to take any action necessary to protect its interest, including paying any sums secured by a lien and to add the amount paid to Rau's indebtedness. Id. ¶ 7. In the event of default, Calvert was required to provide notice of the default to Rau and to permit him thirty days from the date of the notice in which to cure the default. Id. ¶ 21. If Rau failed to cure the default, Calvert was authorized to accelerate the entire indebtedness due and payable and to foreclose upon the Warren Property. Id.

Calvert alleges that Plaintiffs defaulted on their respective loans by failing timely to pay the 2018 summer property taxes on the Windmill and Warren Properties. Def. Mot. at 4. Calvert also asserts that Rau was delinquent in remitting the one-time payment of $12,500 owed under the Warren Mortgage. Id. On October 11, 2018, Calvert mailed to Rau a notice that Calvert had paid overdue property taxes on both the Windmill and Warren Properties and that the amounts paid would be added to the principal balances on the respective properties. 10/11/18 Letter, Ex. 6 to Am. Compl. Plaintiffs allege that they received this letter on October 15, 2018, after Rau attempted to pay the property taxes on both properties and discovered that they had already been paid. Am. Compl. ¶¶ 50-51. As conceded in the Amended Complaint, Calvert paid the 2018 summer property taxes on both properties within two weeks of the original due date; however, Plaintiffs allege that this payment was made before the taxes became "delinquent." Id. ¶¶ 107-108. Plaintiffs also allege that despite their offers to pay Calvert the full amount of property taxes owed, Calvert refused to accept payment. Id. ¶ 60.

On October 31, 2018, Calvert mailed to Plaintiffs a notice of mortgage sale stating that a foreclosure sale on the Windmill Property was to occur on December 5, 2018. Windmill Notice of Mortgage Sale, Ex. 7 to Am. Compl. After receiving the notice, Plaintiffs again offered to pay the property taxes; however, Calvert allegedly continued to refuse the payments. Am. Compl. ¶¶ 57-58. A sheriff's sale of the Windmill Property took place on January 9, 2019, see Sheriff's Deed on Mortgage Sale, Ex. B to Def. Mot. (Dkt. 11-3), but Mchrenzie redeemed the property on June 19, 2019, Redemption Receipt, Ex. C to Def. Mot. (Dkt. 11-4).

On January 4, 2019, Calvert mailed to Rau a notice of default with respect to the Warren Property. Warren Default Letter, Ex. 8 to Am. Compl. The notice specified that Rau had defaulted by failing to remit payment for $12,500 and by failing to pay the property taxes. Id. Therefore,

Calvert provided Rau thirty days, until February 11, 2019, to cure the default by submitting these payments. Id. Rau's counsel responded by letter dated January 24, 2019, noting an error in the amount Calvert stated was owed in property taxes and requesting the payment receipts. 1/24/19 Letter, Ex. 9 to Am. Compl. In a letter dated January 29, 2019, Calvert acknowledged that the amount of taxes owed was misstated in the notice of default and enclosed copies of the paid tax receipts. 1/29/19 Letter, Ex. 10 to Am. Compl. (Dkt. 10). However, Calvert concluded that the mistake did not invalidate the notice or extend the thirty-day cure period. Id. Though Plaintiffs allege that a sheriff's sale on the Warren Property was scheduled to take place on March 20, 2019, there is no indication in the record regarding whether this sale actually occurred. See Am. Compl. ¶ 66.

In the present action, Plaintiffs assert claims alleging: (1) various violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 C.F.R. § 1024.1 et seq., and the Truth in Lending Act ("TILA"), 12 C.F.R. § 1026.1, et seq. (Counts I, II, and III); (2) breach of contract (Count IV); (3) breach of the covenant of good faith and fair dealing (Count VI); (3) fraud (Count VII); (4) violations of the Michigan Consumer Protection Act ("MCPA"), Mich. Comp. Laws § 339.601 et seq. (Count VIII); (5) promissory estoppel (Count IX); and (6) wrongful foreclosure (Count X).[2] Relevant to many of Plaintiffs' claims is the allegation that although Calvert knew Rau intended to reside at the Windmill Property, it wrongfully disguised the Windmill Mortgage as a commercial mortgage in order to circumvent certain state and federal regulations of consumer mortgages. See, e.g., Am. Compl. ¶¶ 117-120.

Defendant has filed a motion to dismiss, which will be granted in part and denied in part.

---

[2] Plaintiffs do not assert a Count V in their Amended Complaint.

## II.  STANDARD OF REVIEW

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "[t]he defendant has the burden of showing that the plaintiff has failed to state a claim for relief."  Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007) (citing Carver v. Bunch, 946 F.2d 451, 454-455 (6th Cir. 1991)), cert. denied, 552 U.S. 1311 (2008).  To survive a Rule 12(b)(6) motion, the plaintiff must allege sufficient facts to state a claim to relief above the speculative level, such that it is "plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The plausibility standard requires courts to accept the alleged facts as true, even when their truth is doubtful, and to make all reasonable inferences in favor of the plaintiff.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Twombly, 550 U.S. at 555-556.

Evaluating a complaint's plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679.  Although a complaint that offers no more than "labels and conclusions," a "formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" will not suffice, id. at 678, it need not contain "detailed factual allegations," Twombly, 550 U.S. at 555; see also Erickson v. Pardus, 551 U.S. 89, 93 (2007) ("[S]pecific facts are not necessary . . . .").  Rather, a complaint needs only enough facts to suggest that discovery may reveal evidence of illegality, even if the likelihood of finding such evidence is remote.  Twombly, 550 U.S. at 556.  Thus, a motion to dismiss "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Directv, 487 F.3d at 476.

"In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the

record of the case, and exhibits attached to the complaint, also may be taken into account." Amini v. Oberlin College, 259 F.3d 493, 502 (6th Cir. 2001) (quoting Nieman v. NLO, Inc., 108 F.3d 1546, 1554 (6th Cir. 1997)) (emphasis omitted). Further, "[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." Weiner v. Klais and Co., Inc., 108 F.3d 86, 89 (6th Cir. 19997) (quoting Venture Assocs. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431 (7th Cir. 1993)). "Supplemental documents attached to the motion to dismiss do not convert the pleading into one for summary judgment where the documents do not 'rebut, challenge, or contradict anything in the plaintiff's complaint.'" Erve v. Henry Ford Cmty. College, No. 13-4705309, 2014 WL 4705309, at *2 (E.D. Mich. Sept. 22, 2014) (quoting Song v. City of Elyria, 985 F.2d 840, 842 (6th Cir. 1993)).

### III. DISCUSSION

#### A. Count I – Violation of 12 C.F.R. § 1024.35(e) (RESPA)

In Count I, Plaintiffs allege that Calvert, in violation 12 C.F.R. § 1024.35(e), failed to respond properly to the notice of error sent by Rau's counsel on January 24, 2019, regarding the erroneous amount of unpaid property taxes identified in the default letter with respect to the Warren Property. Calvert contends that this claim must be dismissed because Plaintiffs have not pleaded any facts that would demonstrate that the loan was a federally related mortgage loan.

Under 12 C.F.R. § 1024.35(e), a servicer of a loan is required to respond to a notice of error from a borrower by either (1) correcting the error identified by the borrower or (2) after conducting a reasonable investigation, notifying the borrower why no error has occurred. The term "error" encompasses a number of specific actions and oversights set forth in § 1024.35(b), and is more generally defined in the catchall provision as "[a]ny other error relating to the servicing of a

borrower's mortgage loan," 12 C.F.R. § 1024.35(b)(11) (emphasis added).  "Servicing," in turn, is defined as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any federally related mortgage loan . . . and making the payments to the owner of the loan or other third parties of principal and interest . . . ."  12 C.F.R. § 1024.2(b).

Calvert contends that Plaintiffs have not alleged facts demonstrating that the Warren Mortgage is a federally related mortgage loan.  A "federally related mortgage loan" is a loan secured by residential real property that meets one of the criterion listed at 12 C.F.R. § 1024.2(b).  Relevant to the present case is the requirement that a federally related mortgage loan "[i]s made in whole or in part by a 'creditor,' as defined in section 103(g) of the Consumer Credit Protection Act (15 U.S.C. 1602(g)), that makes or invests in residential real estate loans aggregating more than $1,000,000 per year."  Id.  A "creditor" is defined under 15 U.S.C. § 1602(g) as "a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness . . . ."

Cases considering whether a RESPA claim was sufficiently pleaded have held that alleging that a loan was a federally related mortgage loan, without further factual elaboration, was sufficient.  Gardner v. First Am. Title Ins. Co., 294 F.3d 991, 994 (8th Cir. 2002); Teeuwissen v. JP Morgan Chase Bank, NA, 902 F. Supp. 2d 826, 836 (S.D. Miss. 2011) (dismissing a RESPA claim where a plaintiff failed to allege in his complaint that his mortgage loan was a federally related mortgage loan).

Here, Plaintiffs' pleadings founder, because they do not allege that the Warren Mortgage is a federally related mortgage loan. Nor do Plaintiffs allege facts from which this Court could infer the Warren Mortgage is a federal related mortgage loan. Plaintiffs allege in their Amended Complaint that Calvert has issued between one and thirteen mortgages per year from 2011 through 2019, summarily concluding that "Calvert is clearly a 'creditor' within the meaning of TILA and RESPA." Id. ¶¶ 67- 68. However, Plaintiffs do not allege that Calvert is a creditor under 15 U.S.C. § 1602(g) or that Calvert's real estate loans aggregate more than $1,000,000 per year.

Plaintiffs, therefore, have not sufficiently alleged either that the Warren Mortgage was a federally related mortgage loan or facts that would permit this Court to conclude that the Warren Mortgage was a federally related mortgage loan. Accordingly, dismissal of Count I is proper.

### B. Counts II and III

#### 1. Consumer Versus Commercial Loans

Calvert contends that because the regulations set forth in RESPA and TILA apply only to consumer loans, Counts II and III of Plaintiffs' Amended Complaint are subject to dismissal to the extent they are premised on the Windmill Mortgage, a commercial mortgage.

Calvert is correct that RESPA and TILA do not apply to commercial loans. See 12 C.F.R. §§ 1024.5(b)(2) (exempting from RESPA regulations loans for business, commercial, or agricultural purposes); § 1026.1(c)(1)(i) (limiting coverage of TILA to extensions of credit to consumers), and § 1026.3(a) (exempting from TILA regulations extensions of credit primarily for business or commercial purposes). Under TILA, a consumer is defined as "a natural person," 12 C.F.R. § 1026(a)(11), and a consumer loan is defined as one extended "primarily for personal, family, or household purposes," 12 C.F.R. § 1026.2(a)(12).

There is no dispute in the present action that the Windmill Mortgage was executed by Mchrenzie, a limited liability company, and not a natural person. Nor is there any dispute that the Windmill Mortgage, on its face, is identified as a commercial real estate mortgage. However, Plaintiffs contend that RESPA and TILA regulations nonetheless apply to the Windmill Mortgage, because it is a consumer loan disguised by Calvert as a commercial loan in order to circumvent state and federal regulations of consumer loans.

In support of this theory, Plaintiffs cite  Sloan v. Urban Title Servs., Inc., 689 F. Supp. 2d 123 (D.D.C. 2010). In Sloan, the loan documents at issue characterized the loan as a commercial loan between the lender and a limited liability company—of which the plaintiff was the sole shareholder. Id. at 127-128. The plaintiff maintained that the loan should be construed as a personal residential loan as opposed to a commercial loan under two alternate theories. First, she alleged that she signed documents related to a consumer loan and not a commercial loan and that the documents describing the loan as commercial were fraudulently obtained by forgery. Id. at 128. Second, the plaintiff alleged that even assuming she did sign the commercial loan documents, the loan was "an illegal consumer residential loan impermissibly disguised as a commercial loan in order to avoid fair lending laws and disclosure requirements." Id. Because the parties presented differing accounts regarding the formation of the limited liability company and the execution of the loan, the court determined that whether the loan was commercial or consumer in nature presented a question of fact. Id.

Calvert attempts to distinguish Sloan by arguing that the case was premised on the allegation that the plaintiff's signature on the commercial loan documents was forged. Def. Reply at 2 (Dkt. 13). As described above, the plaintiff's allegation in Sloan that her signature was forged was distinct from her allegation that, even if she did sign the commercial loan, it was a disguised

consumer loan. 689 F. Supp. 2d at 128. The court declined to grant summary judgment on either theory. Id. Sloan, therefore, supports Plaintiffs' theory that RESPA and TILA apply to the Windmill Mortgage, even though it is identified as a commercial mortgage on its face.

Ultimately, in determining whether a transaction was primarily consumer or commercial in nature, courts "must examine the transaction as a whole and the purpose for which the credit was extended." Riviere v. Banner Chevrolet, Inc., 184 F.3d 457, 462 (5th Cir. 1999). Plaintiffs have alleged that Calvert advised Rau in 2015 to form a limited liability company. Am. Compl. ¶ 14. Plaintiffs have also alleged that Calvert was aware at the time the Windmill Mortgage was executed that Rau intended to use the Windmill Property as his primary residence—and that Rau did, in fact, reside at the property for a period of time. Id. ¶¶ 22-23, 31. However, Plaintiffs allege that Calvert required Mchrenzie to execute the mortgage in order to circumvent the regulations applicable to consumer mortgages. Id. ¶ 24. Taken as true, these facts are sufficient to raise a plausible claim that the Windmill Mortgage was a consumer mortgage disguised as a commercial transaction and that, consequently, RESPA and TILA apply. Although Calvert maintains that the Windmill Mortgage was executed by Rau, a licensed realtor, on behalf of his business, see Def. Reply at 5, the Court must accept as true the facts pleaded by Plaintiffs, Iqbal, 556 U.S. at 678.

Therefore, dismissal of Plaintiffs' RESPA and TILA claims set forth in Counts II and III is not warranted on the ground that the Windmill Mortgage is commercial in nature.

### 2. Count II – Violation of 12 C.F.R. § 1026.41 (TILA)

Count II alleges that from the inception of the Windmill and Warren Mortgages, Calvert has failed to provide periodic mortgage statements regarding either mortgage, in violation of 12 C.F.R. § 1026.41.

Calvert first contends that this claim is time-barred to the extent that it relates to any alleged violation prior to March 20, 2018. Under TILA, an action seeking damages for an alleged violation must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e); see also Coyers v. HSBC Mortg. Servs., Inc., 701 F.3d 1104, 1109 (6th Cir. 2012). Plaintiffs initiated the present action on March 20, 2019. Accordingly, Calvert contends that the claim for damages is time-barred as to any alleged violations of the regulation occurring before March 20, 2018. Plaintiffs concede with respect to Count II that "[t]he one-year limitations period for the damages claim would cover damages resulting from the failure to send monthly statements from March 20, 2018, to March 20, 2019." Pls. Resp. at 10 (Dkt. 12). Any claim for damages arising from Calvert's alleged violation of 12 C.F.R. § 1026.41 are, therefore, limited to violations occurring after March 20, 2018.

Calvert next argues that Count II must be dismissed in its entirety because Calvert is a "small servicer" that is exempt from the requirements of this regulation. Indeed, 12 C.F.R. § 1026.41(e)(4) provides that small servicers are exempted from the requirement of providing consumers with periodic mortgage statements. A "small servicer" is defined, in relevant part, as a servicer that "[s]ervices, together with any affiliates, 5,000 or fewer mortgage loans, for all of which the servicer (or an affiliate) is the creditor or assignee." 12 C.F.R. § 1026.41(e)(4)(ii)(A). Calvert relies on the affidavit of its founder and sole member Mark Calvert, in which he avers that Calvert has never serviced more than twenty-one loans at any given time and currently services eleven loans. Calvert Aff. ¶ 16, Ex. A to Def. Mot. (Dkt. 11-2).

In deciding Rule 12(b)(6) motions, courts are constrained to consider only the allegations in the complaint, matters of public record, and exhibits attached to the complaint. Amini, 259 F.3d at 502. "[D]ocuments that a defendant attaches to a motion to dismiss are considered part of the

pleadings if they are referred to in the plaintiff's complaint and are central to her claim." Weiner, 108 F.3d at 89 (citation and internal quotation marks omitted). Because Mark Calvert's affidavit is neither referenced in Plaintiffs' complaint nor central to their claims, it may not be considered by the Court at this stage of the litigation. Calvert's argument is, therefore, unavailing. Although dismissal of Count II in its entirety is not warranted, the claim is limited to the recovery of damages stemming from violations occurring after March 20, 2018.

### 3. Count III – Violation of 12 C.F.R. §§ 1026.19(e) and 1026.37 (TILA)

Count III alleges that Calvert failed to provide certain disclosures regarding the Windmill and Warren Mortgages at the time those transactions took place, as required under 12 C.F.R. §§ 1026.19(e) and 1026.37.

Calvert first contends that this claim is time-barred under the one-year limitations period applicable to actions asserting violations of TILA. See 15 U.S.C. § 1640(e). The loan transaction for the Windmill Mortgage was completed on June 30, 2017, Windmill Mortgage ¶ 5, Ex. 2 to Am. Compl., and the loan transaction for the Warren Mortgage was completed on November 16, 2017, Warren Mortgage ¶ 2, Ex. 5 to Am. Compl. Therefore, Calvert maintains that the limitations periods with respect to the Windmill and Warren Mortgages expired on June 30, 2018, and November 16, 2018, respectively. The present action, however, was not filed until March 20, 2019. Plaintiffs respond that Count III sets forth a claim seeking rescission of the Windmill and Warren Mortgages—a claim governed by a three-year statute of limitations. Pls. Resp. at 10-11.[3]

A debtor's right under TILA to rescind a transaction involving a security interest on his residence is governed by 15 U.S.C. § 1635. Under 15 U.S.C. § 1635(f), "[a]n obligor's right of

---

[3] Plaintiffs, therefore, indirectly concede that any claim for damages would be time-barred under the one-year statute of limitations.

rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first." However, the right of rescission set forth under § 1635 does not extend to a "residential mortgage transaction," 15 U.S.C. § 1635(e)(1), defined as "a transaction in which a mortgage . . . is created or retained against the consumer's dwelling <u>to finance the acquisition</u> or initial construction of such dwelling," 15 U.S.C. § 1602(x) (emphasis added).

As discussed above, the Court must assume that the Windmill Mortgage is a consumer mortgage in order for TILA to apply. Accepting the Plaintiffs' pleadings as true, both the Windmill and Warren Mortgages are residential mortgage transactions, because they involve mortgages against Rau's residences created to finance the acquisition of the properties. Am. Compl. ¶¶ 22, 25, 31-33. Plaintiffs thus cannot state a claim seeking to rescind either the Windmill or Warren Mortgages. Moreover, Plaintiffs concede that any claim for damages is time-barred under the statute of limitations. Therefore, Count III must be dismissed because a claim for damages is time-barred and because Plaintiffs fail to state a viable claim seeking rescission.

### C. Count IV – Breach of Contract

Count IV asserts that Calvert breached the Windmill and Warren Mortgages by (1) paying the property taxes before those taxes became delinquent; (2) failing to provide notice of its intent to pay the property taxes; (3) foreclosing on the properties when Plaintiffs had not defaulted; and (4) foreclosing on the properties without affording Plaintiffs an opportunity to cure and in spite of Plaintiffs' offers to pay the taxes. Am. Compl. ¶¶ 107-108. Calvert seeks dismissal of Plaintiffs' breach of contract claim on the ground that Plaintiffs have failed to identify any specific terms of the contracts allegedly breached.

Although Calvert is correct that Plaintiffs have not identified the exact provisions they claim were breached, they have sufficiently alleged the substance of the breaches such that the provisions are readily identified in the Warren Mortgage. Specifically, the Warren Mortgage provides as follows:

> If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

Warren Mortgage ¶ 4, Ex. 5 to Am. Compl. Additionally, the Warren Mortgage authorized Calvert to protect its rights in the property as follows:

> If Borrower fails to perform the covenants and agreements contained in this Security Instrument . . . then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument.

Id. ¶ 7. Finally, in the event of Rau's default, the Warren Mortgage required Calvert to give notice to Rau before either accelerating payment of the debt or invoking the power of sale. Id. ¶ 21. This notice was required to specify the following:

> (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property.

Id.

Under the Warren Mortgage, Rau was obligated to pay all taxes and assessments "on time directly to the person owed payment." Id. ¶ 4 (emphasis added). The meaning of the term "on time" is ambiguous, as it is reasonably susceptible to differing interpretations. See Cole v. Ladbroke Racing Mich., Inc., 614 N.W.2d 169, 176 (Mich. Ct. App. 2000). Plaintiffs allege there is a distinction between the date taxes are designated as "due" and the date they achieve

"delinquent" status.  <u>See</u> Am. Compl. ¶¶ 107-108.  Thus, the requirement that taxes be paid "on time" could be interpreted as either (1) requiring payment of taxes by the date they become due or (2) requiring payment of taxes before they achieve delinquent status.  Rau alleges that Calvert paid the taxes on the Warren Property within two weeks of their original due date and before they became delinquent.  <u>Id.</u>  Thus, Rau plausibly alleges that he was not in default of his obligation to pay taxes under the Warren Mortgage.

As set forth above, Calvert's authority to pay any sums secured by a tax lien did not become operative unless Rau failed to perform his obligations under the Warren Mortgage, thereby giving rise to a lien.  Here, Rau has alleged that he did not fail to discharge his obligation to pay the taxes on the Warren Property "on time," as the unpaid taxes had not achieved delinquent status, let alone given rise to a lien.  Further, in the event Calvert determined that the Warren Property was subject to a tax lien, the Warren Mortgage provided that Calvert "may give" Rau notice of the lien and ten days in which to cure.  <u>See</u> Warren Mortgage ¶ 4.  Whether Calvert was obligated to afford Rau a notice of a lien and ten days in which to cure is ambiguous— although the provision is stated in permissive terms, it is also reasonable to construe it as mandatory, especially in light of the provision requiring notice of a default.  Accordingly, Rau has plausibly alleged that Calvert breached the Warren Mortgage by paying the property taxes before they became delinquent and by failing to provide Rau notice of its intent to pay.

Finally, the Warren Mortgage provides that Calvert's authority to accelerate payments and to invoke the power of sale were contingent on Rau's default and Calvert's provision of both a notice of default and an opportunity to cure.  While not pleaded clearly, the Amended Complaint suggests that Calvert breached the Warren Mortgage by initiating foreclosure proceedings when Rau did not, in fact, default because the property taxes were not delinquent.  <u>See</u> Am. Compl. ¶¶

107-108. Similarly, Rau alleges that Calvert denied him an opportunity to cure because it refused to accept his offers to pay the taxes. Id.

However, Rau does not contest the separate default underlying the foreclosure proceedings—that he failed timely to make the one-time payment of $12,500. Warren Default Letter, Ex. 8 to Am. Compl. Nor does he allege that he offered to cure this default by making the payment of $12,500. Therefore, Rau has not plausibly alleged that Calvert breached the Warren Mortgage by foreclosing on the Warren Property in the absence of a default. And because it is uncontested that Rau did not offer to cure his failure to pay $12,500, Rau has not plausibly alleged that Calvert denied him an opportunity to cure when it refused to accept his offers to pay the property taxes but not the $12,500. See Warren Mortgage ¶ 21.

The Windmill Mortgage, in contrast, does not incorporate any of the provisions from the Warren Mortgage quoted above. To the contrary, the Windmill Mortgage expressly provided that in the event of Mchrenzie's default, Calvert was authorized, "without demand or notice, [to] pay any taxes, assessments, premiums or liens required to be paid by the Mortgagor," or "without notice, and at its option, [to] declare the entire Indebtedness due and payable . . . and, if permitted by state law, is authorized and empowered to sell or to cause the Property to be sold at public auction." Windmill Mortgage ¶¶ 13-14, Ex. 2 to Am. Compl. Mchrenzie likewise waived its right to "notice of every kind" in the Promissory Note. Windmill Promissory Note, Ex. 1 to Am. Compl. It is clear from the contractual language of the Windmill Mortgage that Calvert was under no obligation to provide either notice of its intent to pay property taxes or notice of default and an opportunity to cure. Plaintiffs, therefore, have failed to state a claim that Calvert breached the Windmill Mortgage on those grounds.

Similar to their earlier argument with respect to the application of RESPA and TILA to the Windmill Mortgage, Plaintiffs contend that notice and an opportunity to cure would have been required had the Windmill Mortgage been properly classified as a residential mortgage. Pls. Resp. at 16 n.1. In Sloan, discussed above, the plaintiff asserted that "a contract was formed when Plaintiff accepted the [defendants'] offer to extend a residential loan, and that the [defendants] breached that contract by delivering, not a residential loan under terms that are legal under fair lending laws, but rather a commercial loan that would be illegal if it were a loan to a person." Juergens v. Urban Title Servs., Inc., 246 F.R.D. 4, 14 (D.D.C. 2007) (internal quotation marks omitted). The court permitted the plaintiff to amend her complaint to modify her breach of contract claim to add this theory, id. at 17, and repeatedly found thereafter that factual disputes regarding the issuance of the loan precluded summary judgment, see Sloan, 689 F. Supp. 2d at 128; 652 F. Supp. 2d 51, 57-58 (D.D.C. 2009).

Here, in contrast, Plaintiffs do not allege that the parties ever formed an agreement to enter into a residential loan in connection with the Windmill Mortgage, or that Calvert breached this agreement. Rather, Plaintiffs allege that "Calvert required that the mortgage transaction occur within [sic] Mchrenzie" and that Calvert "required that Rau place the [property] into a separate entity in order to circumvent the requirements of Dodd-Frank, TILA, RESPA, and various other federal and state laws . . . ." Am. Compl. ¶¶ 23-24. Though Plaintiffs contend that they would have been entitled to notice and an opportunity to cure if the Windmill Mortgage would have been properly classified as a residential mortgage as opposed to a commercial mortgage, such a claim would sound in statutory regulation and not the contract presently before the Court. Accordingly, Plaintiffs have not stated a plausible breach of contract claim premised on a lack of notice with respect to the Windmill Mortgage.

Plaintiffs also contend that Calvert breached the Windmill Mortgage by paying the property taxes and initiating foreclosure proceedings when Mchrenzie was not in default. Indeed, Calvert's authority under the Windmill Mortgage to pay property taxes, to accelerate the indebtedness, and to invoke the power of sale was contingent on Mchrenzie's default. Calvert's authority to pay tax assessments became operative "[i]f Borrower fail[ed] to perform the covenants and agreements contained in this Security Instrument," while the authority to accelerate the indebtedness and invoke the power of sale became operative "[i]n the event of default . . . ." Windmill Mortgage ¶¶ 13-14.

Under the Windmill Mortgage, Mchrenzie was obligated to pay taxes and assessments "at any time levied or assessed against the Mortgagor or the Property . . . ." Id. ¶ 5. Similar to the phrase "on time," discussed above in connection with the Warren Mortgage, the phrase "at any time levied" is ambiguous. It is unclear whether this phrase required payment of property taxes at the time a tax notice is received by a property owner, at the time payment is due as specified in a notice, or at any time before the taxes become delinquent. Mchrenzie alleges that Calvert paid the taxes on the Windmill Property within only two weeks of their original due date and before they became delinquent. Am. Compl. ¶¶ 107-108. Thus, Mchrenzie plausibly alleges that it was not in default of its obligation to pay taxes under the Windmill Mortgage. Consequently, Mchrenzie has adequately stated a claim that Calvert breached the Windmill Mortgage by paying the taxes and by initiating foreclosure proceedings when Mchrenzie was not in default.

Therefore, Count IV must be dismissed insofar as it asserts that Calvert breached the Warren Mortgage by foreclosing on the Warren Property in the absence of a default and by failing to provide an opportunity to cure. Additionally, Count IV must be dismissed insofar as it asserts that Calvert breached the Windmill Mortgage by failing to provide notice of its intent to pay taxes

and notice of default.  Plaintiffs, however, have sufficiently pleaded that Calvert breached the Warren Mortgage by paying the property taxes and by failing to provide notice of its intent to pay. They have also adequately pleaded that Calvert breached the Windmill Mortgage by paying the property taxes and by initiating foreclosure proceedings in the absence of a default.

### D.  Count VI – Breach of the Covenant of Good Faith and Fair Dealing

Count VI asserts a claim for breach of the covenant of good faith and fair dealing.  Calvert contends that this count must be dismissed on the ground that Michigan does not recognize a cause of action for breach of the covenant of good faith and fair dealing.

"[T]he covenant of good faith and fair dealing is an implied promise contained in every contract that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Hammond v. United of Oakland, Inc., 483 N.W.2d 652, 655 (Mich. Ct. App. 1992) (citation and internal quotation marks omitted). Calvert is correct that many courts have held that "Michigan does not recognize a claim for breach of an implied covenant of good faith and fair dealing."  See Belle Isle Grill Corp. v. City of Detroit, 666 N.W.2d 271, 279 (Mich. Ct. App. 2003).  Nevertheless, courts have also held that a claim for breach of the covenant of good faith and fair dealing may be sustained under Michigan law where the claim does not seek to override, contradict, or add a new term to the express terms of a contract. See Warren Prescriptions, Inc. v. Walgreen Co., No. 17-10520, 2018 WL 287951, at *1 (E.D. Mich. Jan. 4, 2018).  The covenant of good faith and fair dealing has been applied accordingly in cases where a party is afforded discretion in the manner of its performance under a contract and the party exercises that discretion in bad faith.  See id. (citing Burkhardt v. City Nat'l Bank of Detroit, 226 N.W.2d 678, 680 (Mich. Ct. App. 1975)); see also Burniac v. Wells Fargo Bank, N.A., No. 13-CV-12741, 2015 WL 401018, at *20 (E.D. Mich. Jan. 28, 2015).

Given the authority holding that a claim asserting breach of the covenant of good faith and fair dealing is cognizable when it is premised on a party's alleged exercise of discretion in bad faith, the Court declines to dismiss Count VI of Plaintiff's Amended Complaint out of hand. Plaintiffs allege that Calvert acted in bad faith when it paid the taxes assessed on the Windmill and Warren Properties before they became delinquent and subsequently foreclosed on the properties while refusing to accept Plaintiffs' offers of payment. Am. Compl. ¶ 113. At heart, Plaintiffs' claim centers on Calvert's alleged refusal to accept payment of the property taxes in favor of foreclosing on the properties. Assuming that Plaintiffs' allegations are true, it is plausible that Calvert breached the covenant of good faith and fair dealing by exercising its discretion to refuse Plaintiffs' offers to pay the unpaid taxes.

### E. Count VII – Fraud

In Count VII, Plaintiffs assert a claim for fraud premised on Calvert's alleged disguise of the Windmill Mortgage as a commercial mortgage for the purpose of circumventing state and federal regulations of consumer mortgages.

When pleading a claim for fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Under Michigan law, plaintiffs must plead the following facts: "(1) [t]hat defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury." Llewellyn-Jones v. Metro Prop. Group, LLC, 22 F. Supp. 3d 760, 784 (E.D. Mich. 2014) (internal quotation marks omitted) (citing Hi-Way Motor Co. v. Int'l Harvester Co., 247 N.W.2d 813, 815-816 (1976)).

Here, the Amended Complaint alleges that Calvert falsely represented to Plaintiffs at the time the Windmill Mortgage was executed that the mortgage was commercial in nature as opposed to a consumer mortgage. Am. Compl. ¶¶ 121-122. Although Calvert allegedly was aware of Rau's intent to reside at the Windmill Property, it required Mchrenzie to execute a commercial mortgage in order to circumvent state and federal regulations of consumer mortgages. Id. ¶ 119. Plaintiffs allege they acted in reliance on Calvert's representation by executing the Windmill Mortgage as a commercial mortgage and were damaged as a result of Calvert's foreclosure without providing notice or the opportunity to cure. Id. ¶¶ 125-126.

A claim for fraud requires reasonable reliance on a false representation. Cummins v. Robinson Twp., 770 N.W.2d 421, 437 (Mich. Ct. App. 2009) (citing Nieves v. Bell Indus., Inc., 517 N.W.2d 235, 238 (Mich. Ct. App. 1994)). Reliance is not reasonable where the alleged misrepresentation concerns matters "at least equally within plaintiffs' knowledge or their ability to determine." Id. Likewise, "fraud is not perpetrated upon one who has full knowledge to the contrary of a representation." Montgomery Ward & Co. v. Williams, 47 N.W.2d 607, 611 (Mich. 1951) (explaining that where the plaintiff's agent was informed of facts concerning the defendant's injury disqualifying him from receiving health and accident insurance benefits, the plaintiff's subsequent payment of insurance benefits did not give rise to a claim for fraud); Phillips v. Smeekens, 213 N.W.2d 862, 862 (Mich. Ct. App. 1973) ("[O]ne cannot rely on a representation where he knows other representations in the same transaction are false."). Moreover, where a transaction is executed with full knowledge of the facts, a party's misapprehension of the legal ramifications of that transaction cannot serve as the basis for a claim for fraud. Williams, 47 N.W.2d at 612.

Plaintiffs' claim for fraud is premised on their allegation that Calvert "disguised" the Windmill Mortgage as a commercial mortgage rather than designating it a consumer mortgage. Rau states that he intended to use the Windmill Property as his residence and, consequently, that he intended to execute a consumer mortgage. Am. Compl. ¶¶ 22, 117. On its face, the Windmill Mortgage was clearly designated as a commercial real estate mortgage. Nevertheless, Mchrenzie executed the Windmill Mortgage, as well as an acknowledgement that the property would not be owner-occupied as a primary residence. See Windmill Buyers Acceptance and Acknowledgement, Ex. A.3 to Def. Mot. (Dkt. 11-2). In view of these facts, Plaintiffs were fully aware that the Windmill Mortgage was designated as a commercial mortgage and not a consumer mortgage. Under Michigan law, plaintiffs are presumed to know the law. Cummins, 770 N.W.2d at 437. As such, Plaintiffs' claim for fraud cannot be sustained based on a misapprehension of their legal rights and obligations as a result of executing a commercial mortgage rather than a consumer mortgage. Plaintiffs' claim for fraud, therefore, must be dismissed.

### F. Count VIII – Violation of the MCPA

Count VIII alleges the following three violations of the MCPA: (1) causing a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of a party to a transaction, in violation of Mich. Comp. Laws § 445.903(1)(n); (2) causing a probability of confusion or of misunderstanding as to the terms or conditions of credit if credit is extended in a transaction, in violation of Mich. Comp. Laws § 445.903(1)(o); and (3) making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, and otherwise using unfair, unconscionable, or deceptive acts or practices in connection with a business, in violation of Mich.

Comp. Laws § 445.903(1)(bb). Plaintiffs again argue that Calvert violated these provisions by disguising the Windmill Mortgage as a commercial mortgage. Pls. Resp. at 22.

First, Calvert seeks dismissal of this count because the MCPA applies to consumer but not commercial transactions. Def. Reply at 5. Plaintiffs' MCPA claim is premised on alleged violations of Mich. Comp. Laws § 445.903(1), which prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . ." (Emphasis added). The MCPA defines "trade or commerce" as "the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes." Mich. Comp. Laws § 445.902(1)(g) (emphasis added). The MCPA is thus inapplicable to transactions made for business or commercial purposes. See Jackson Cty. Hog Producers v. Consumers Power Co., 592 N.W.2d 112, 117 (Mich. Ct. App. 1999). As determined above with respect to the application of RESPA and TILA, Plaintiffs have alleged a plausible claim that the Windmill Mortgage is a consumer loan. However, to the extent that it is later determined that the Windmill Mortgage is a commercial loan, the MCPA would not apply.

Second, Calvert argues that the MCPA does not apply to mortgage transactions. The MCPA exempts from its purview "[a] transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States." Mich. Comp. Laws § 445.904(1)(a). In determining whether the exemption applies, "the relevant inquiry 'is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited.'" Liss v. Lewiston-Richards, Inc., 732 N.W.2d 514, 518 (Mich. 2007) (quoting Smith v. Globe Life Ins. Co., 597 N.W.2d 28, 38 (Mich. 1999)). Lenders transacting residential mortgage loans have been found to be exempt from the MCPA under Mich. Comp. Laws § 445.904(1)(a) because they are regulated under a

variety of state and federal laws. <u>See</u> <u>Newton v. West</u>, 686 N.W.2d 491, 493 (Mich. Ct. App. 2004); <u>see also</u> <u>Ursery v. Option One Mortg. Corp.</u>, No. 271560, 2007 WL 2192657, at *15-16 (Mich. Ct. App. July 31, 2007).

Even assuming that the Windmill Mortgage is a consumer mortgage, Calvert has not identified a single regulation or licensing requirement governing the transaction at issue here. Calvert disputes, for example, that the transaction is governed under RESPA because it is not a federally related mortgage loan. Simply put, Calvert cannot have its cake and eat it too. Until Calvert identifies at least one regulatory board or regulatory scheme governing the Windmill Mortgage, the Court is unable to determine that the mortgage was "specifically authorized under laws administered by a regulatory board" and exempt from the MCPA.

Finally, Calvert contends that Plaintiffs failed to identify the specific conduct underlying their claims that Calvert made a misrepresentation of material fact and caused a likelihood of confusion or misunderstanding regarding Plaintiffs' legal rights, remedies, or the terms or conditions of credit. To the contrary, Plaintiffs allege that Calvert misrepresented that the Windmill Mortgage was a commercial real estate mortgage instead of a consumer mortgage. Am. Compl. ¶¶ 130, 132. Such an alleged misrepresentation, on its face, could plausibly result in the confusion of a reasonable consumer as to his legal rights, remedies, and terms and conditions of credit, as regulated by Michigan Compiled Laws § 445.903(1)(n), (o), and (bb). Plaintiffs have, therefore, adequately stated a claim alleging violations of the MCPA. Dismissal of this claim is not warranted.

### G. Count IX – Promissory Estoppel

In Count IX, Plaintiffs assert a claim for promissory estoppel, alleging that "it would be inequitable and unjust to treat the Windmill Promissory Note and Mortgage as a commercial

transaction" and to permit Calvert to circumvent the state and federal regulations of consumer loans. Am. Compl. ¶ 146.

The elements of a promissory estoppel claim include the following: "(1) a promise, (2) that the promisor reasonably should have expected to induce action of a definite and substantial character on the part of the promisee, (3) which in fact produced reliance or injustice is to be avoided." Parkhurst Homes, Inc. v. McLaughlin, 466 N.W.2d 404, 406 (Mich. Ct. App. 1991). "A promise giving rise to an actionable claim must be 'clear and definite,' while statements that are 'indefinite, equivocal, or not specifically demonstrative of an intention respecting future conduct, cannot serve as the foundation for an actionable reliance.'" Bodnar v. St. John Providence, Inc., 933 N.W.2d 363, 377 (Mich. Ct. App. 2019) (quoting State Bank of Standish v. Curry, 500 N.W.2d 104, 108 (Mich. 1993)). Though far from clear, the Amended Complaint appears to premise this claim on the allegation that Calvert disguised the Windmill Mortgage as a commercial mortgage. See Am. Compl. ¶¶ 142-143. However, Plaintiffs do not allege that Calvert made any promise in connection with the Windmill Mortgage. Plaintiffs do not allege that Calvert made any representations regarding its future conduct—for example, by representing that any particular protection governing consumer mortgages would apply. Dismissal of this claim is, therefore, appropriate.

## H. Count X – Wrongful Foreclosure

In Count X, Plaintiffs allege that Calvert wrongfully foreclosed on the Windmill and Warren Properties in violation of Michigan Compiled Laws §§ 600.3180 et seq.[4] First, Plaintiffs

---

[4] Although Plaintiffs allege that Calvert scheduled a foreclosure sale of the Warren Property for March 20, 2019, Am. Compl. ¶ 163, no information on whether this sale actually took place has been provided.

contend that they were not in default with respect to either the Windmill or the Warren Mortgage. Second, Plaintiffs contend they were deprived of adequate notice and an opportunity to cure.

Under Michigan Compiled Laws § 600.3204, a party may foreclose a mortgage by advertisement if, among other conditions, "[a] default in a condition of the mortgage has occurred, by which the power to sell became operative." The mortgage holder must provide a notice of foreclosure by advertisement that includes the following information:

> (a) The names of the mortgagor, the original mortgagee, and the foreclosing assignee, if any.
> (b) The date of the mortgage and the date the mortgage was recorded.
> (c) The amount claimed to be due on the mortgage on the date of the notice.
> (d) A description of the mortgaged premises that substantially conforms with the description contained in the mortgage.
> (e) For a mortgage executed on or after January 1, 1965, the length of the redemption period as determined under section 3240.
> (f) A statement that if the property is sold at a foreclosure sale under this chapter, under section 3278 the borrower will be held responsible to the person who buys the property at the mortgage foreclosure sale or to the mortgage holder for damaging the property during the redemption period.

Id. § 600.3212. This notice is to be published for four successive weeks in a newspaper published in the county where the premises are situated and is also to be posted in a conspicuous place on the premises. Id. § 600.3208. In order to set aside a foreclosure sale on the basis of an irregularity in the foreclosure proceedings, parties opposing the sale "must show that they were prejudiced by" the alleged failure to comply with any of the statutory requirements. Kim v. JP Morgan Chase Bank, N.A., 825 N.W.2d 329, 337 (Mich. 2012). Further, the alleged irregularity must relate to the "legal measures" of the foreclosure procedure itself. Williams v. Pledged Property II, LLC, 508 F. App'x 465, 468 (6th Cir. 2012).

With respect to the Windmill Mortgage, Plaintiffs contend in their brief that Calvert initiated foreclosure proceedings in violation of Michigan Compiled Laws § 600.3204 because Mchrenzie was not in default, thereby rendering the power to sell inoperative. Pls. Resp. at 23.

As discussed above in connection with Plaintiffs' breach of contract claim, Mchrenzie has asserted a plausible claim that it was not in default of its obligation to pay taxes "at any time levied" under the Windmill Mortgage. As stated above, Michigan Compiled Laws § 600.3204 provides that a party may foreclose a mortgage by advertisement only if a "default in a condition of the mortgage has occurred." A lender's foreclosure on property in the absence of mortgage holder's default constitutes an "irregularity" in the foreclosure procedures sufficient to establish prejudice. See Powers v. Bank of Am., N.A., 63 F. Supp. 3d 747, 753 (E.D. Mich. 2014). Accordingly, Mchrenzie has alleged a plausible claim of wrongful foreclosure on the ground that it was not in default of the Windmill Mortgage.

Mchrenzie also contends with respect to the Windmill Mortgage that it received no notice of default and was not afforded the opportunity to cure. However, the notice provided by Calvert to Mchrenzie regarding the foreclosure of the Windmill Property was consistent with the requirements of Michigan Compiled Laws § 600.3212. On October 31, 2018, Calvert sent to Mchrenzie a notice of mortgage sale indicating its intent to foreclose on the Windmill Property. See Windmill Notice of Mortgage Sale, Ex. 7 to Am. Compl. This notice included the names of the mortgagor and mortgagee, the dates the Windmill Mortgage was executed and recorded, the amount due under the mortgage, a description of the mortgaged premises, the length of the redemption period, and a statement regarding responsibility for damages. Id. This notice was published in the Flint-Genesee County Legal News on November 2, November 9, November 16, and November 23 of 2018, and indicated a sheriff's sale date of December 5, 2018. Aff. of Publication, Ex. B to Def. Mot. (Dkt. 11-3). The notice was again published on December 14, December 21, and December 28 of 2018, and indicated a sheriff's sale date of January 9, 2019.

Id. Calvert, therefore, provided Mchrenzie valid notice of foreclosure of the Windmill Mortgage as required under Michigan's foreclosure-by-advertisement statute.

Mchrenzie contends that before initiating foreclosure proceedings, Calvert was required to provide a notice of default informing it of its right to bring a court action, as well as an opportunity to cure the default within thirty days. Although Michigan law previously required lenders to provide a notice of default containing certain information and to delay foreclosure proceedings for thirty days to enable borrowers to pursue loan modification, Mich. Comp. Laws § 600.3205a(1), these provisions were repealed by 2012 Michigan Public Acts No. 521, effective June 30, 2013. Michigan's current foreclosure-by-advertisement statute regulates only notices of foreclosure but does not require notices of default. See Mich. Comp. Laws § 600.3212. Mchrenzie cites no other statutory authority requiring lenders to provide consumers a notice of default and an opportunity to cure within thirty days.

Mchrenzie also asserts it was prejudiced by Calvert's wrongful refusal to accept its tender of the full amount of property taxes owed; however, that refusal does not amount to an irregularity relating to the statutory foreclosure procedures themselves. See Jundy v. Wells Fargo Bank, N.A., No. 14-12524, 2015 WL 5697658, at *5 (E.D. Mich. Sept. 29, 2015) (lender's refusal to accept the borrower's tender of the amount due to reinstate his loan did not relate to the foreclosure proceedings). Mchrenzie's wrongful foreclosure claim, therefore, is dismissed to the extent that it is premised on the allegation that Mchrenzie was deprived of notice and an opportunity to cure with respect to the Windmill Mortgage.

As with the Windmill Property, Plaintiffs contend that Calvert wrongfully foreclosed on the Warren Property in violation of Michigan Compiled Laws § 600.3204 because Rau was not in default. Pls. Resp. at 23. Specifically, Rau alleges that he was not in default of his obligation

under the Warren Mortgage to pay property taxes "on time" because the taxes, though two weeks late, were not yet delinquent. However, Rau was in default of the Warren Mortgage based not only on his alleged failure to pay the property taxes but also on his failure to make a one-time payment of $12,500. See Warren Default Letter, Ex. 8 to Am. Compl. Plaintiffs do not dispute that Rau defaulted by failing to make the payment of $12,500, nor do they allege that Rau offered to cure this default by tendering the $12,500 owed. Rau, therefore, has not alleged facts supporting his position that he was not in default of the Warren Mortgage and, consequently, that Calvert wrongfully foreclosed.

Plaintiffs also contend with respect to the Warren Mortgage that the notice of default was defective and that Rau was not afforded an opportunity to cure. Specifically, Plaintiffs allege that Calvert's January 24, 2019 notice of default in connection with the Warren Mortgage was defective because it contained inaccurate information regarding the amount of property taxes owed. See 1/24/19 Letter, Ex. 9 to Am. Compl. As discussed above in reference to the Windmill Mortgage, however, those portions of Michigan's foreclosure-by-advertisement statute requiring lenders to provide notice of default and to delay foreclosure proceedings by thirty days have been repealed. See 2012 Mich. Pub. Acts No. 521, effective June 30, 2013. Michigan's current statute regulates only notices of foreclosure and not notices of default. See Mich. Comp. Laws § 600.3212. Plaintiffs cite no statutory authority requiring lenders to provide consumers notice of default or an opportunity to cure. Likewise, as determined above, Rau's contention that Calvert wrongfully rejected his offers to pay the full amount of the property taxes owed lacks merit, as such rejection does not relate to the foreclosure procedures. See Jundy, 2015 WL 5697658 at *5. Plaintiffs' claim asserting wrongful foreclosure of the Warren Property on the basis of a defective notice of default and the deprivation of an opportunity to cure must be dismissed.

Finally, Calvert contends that Mchrenzie's redemption of the Windmill Property extinguishes its right to challenge the foreclosure proceedings because the redemption ratified the foreclosure sale. Calvert's argument is flawed. A mortgage holder may dispute foreclosure proceedings yet redeem the property in an effort to protect his interest in the property. Nothing about such a course of action implies that the mortgage holder ratified the foreclosure proceedings. Moreover, the authority Calvert relies upon in support of its premise is inapposite. Specifically, Calvert cites cases estopping mortgage holders from challenging foreclosure sales when they unreasonably delayed in seeking relief. See Fox v. Jacobs, 286 N.W.2d 854, 857 (Mich. 1939) (mortgage holder did not challenge alleged defects in the foreclosure notice for twenty months following the foreclosure sale); Walker v. Schultz, 141 N.W. 543, 545 (Mich. 1913) (mortgage holder did not challenge an irregularity in a foreclosure proceeding for years). However, there is no assertion here that Plaintiffs unreasonably delayed in challenging the foreclosure proceedings, and Calvert cites no authority specifically holding that exercising the right of redemption results in a waiver of the right to challenge the foreclosure proceedings.

## IV. CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part Calvert's motion to dismiss. Specifically, the following claims are dismissed in their entirety: (1) violation of 12 C.F.R. § 1024.35(e) (Count I); (2) violation of 12 C.F.R. §§ 1026.19(e) and 1026.37 (Count III); (3) fraud (Count VII); and (4) promissory estoppel (Count IX).

The following claims are permitted to proceed in a limited context: (1) violation of 12 C.F.R. § 1026.41 (Count II) except to the extent that it seeks recovery of damages for violations occurring before March 20, 2018; (2) breach of contract (Count IV), to the extent that it asserts Calvert breached the Warren Mortgage by paying the property taxes and by failing to provide

notice of its intent to pay, and to the extent that it asserts Calvert breached the Windmill Mortgage by paying the property taxes and by initiating foreclosure proceedings in the absence of a default; (3) breach of the covenant of good faith and fair dealing (Count VI), to the extent that it is premised on Calvert's alleged refusal to accept Plaintiffs' offers to pay the full amount of property taxes owed; (4) violation of the MCPA (Count VIII); and (5) wrongful foreclosure (Count X) to the extent that that it is premised on a lack of default on the Windmill Mortgage.

SO ORDERED.

Dated:  November 27, 2019                              s/Mark A. Goldsmith
      Detroit, Michigan                              MARK A. GOLDSMITH
                                        United States District Judge